IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| WARREN PHILLIPS,<br><br>Plaintiff,<br><br>vs.<br><br>ALEXANDER OOSTERBAAN, and DOE OCCUPANTS I through X, inclusive,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No.  2:18-cv-508<br><br>Judge Clark Waddoups |

## INTRODUCTION

Alexander Oosterbaan ("Oosterbaan")  moves to dismiss this action for lack of personal jurisdiction based on immunity under the Vienna Convention.  Oosterbaan was on assignment from the Netherlands to work with the United States on a coordinated program involving F-16 aircraft at Hill Air Force Base.  He was not classified as a diplomatic agent for the assignment, but he did have status as a technical or administrative staff member for the mission.  Oosterbaan lived in Utah for part of his assignment and leased a house.  When the house was sold to Warren Phillips ("Phillips"), subject to the lease, Phillips sought immediate entry to conduct repairs.  Oosterbaan refused immediate entry due, in part, to confidential mission documents and computers kept at the home.  Oosterbaan offered to allow entry at another time, with appropriate supervision, but the offer was not acceptable to Phillips.  Accordingly, Phillips filed suit for breach of contract and unlawful detainer.  Because the court concludes Oosterbaan acted in furtherance of his mission, and had diplomatic immunity, the court grants the motion to dismiss.

## FACTUAL BACKGROUND

**Overview of the Dispute**

On May 6, 2016, Oosterbaan entered into a Lease Agreement with Daniel Howard ("Howard") to lease a house from July 1, 2016 through June 30, 2019 (the "Residence"). Lease Agmt., at 2 (ECF No. 2-1).[1] In 2017, Howard decided to market the property. At about that same time, he and Oosterbaan renegotiated the lease terms to state that the lease would end on July 31, 2018 and Oosterbaan would have free rent from April 2018 through July 2018. Lease Cancellation & Termination Agmt., at 2 (ECF No. 2-2).

In April 2018, Phillips entered a contract to purchase the home from Howard. During his due diligence period, Phillips took pictures of water damaged areas and melting snow running off the house, and on May 1, 2018, he received an inspection report stating mold was present from potential ongoing water leaks. Phillips Aff'd, ¶ 11, 14 (ECF No. 8-2), Mold Rpt., at 11–13 (ECF No. 8-2); Pictures, 27–30 (ECF No. 8-2). Although Oosterbaan asked to be informed if mold was found, so he could have Howard make repairs, Oosterbaan was not told about it until June 1, 2018. Phillips Aff'd, ¶¶ 12, 15–16. Phillips also did not seek to have the water leaks and mold problem repaired before closing.

Instead, Phillips sought entry into the Residence on June 6, 2018, via a 24-hour notice of intent to enter.[2] *See* Notice, at 2 (ECF No. 2-3). When Oosterbaan delayed entry, Phillips filed

---

[1] When referencing a pincite in the record, the court refers to the ECF pagination at the top of the page and not the page numbers at the bottom or side of a page.

[2] Phillips asserts the need to enter the Residence was urgent "to avoid further damage . . . and to protect the health and safety of [the] occupants." Memo. in Opp'n, at 3 (ECF No. 8). If the repairs were urgent, the court questions why Phillips waited more than a month to start the repairs or have Howard start the repairs. The court takes judicial notice that in June 2018, "Utah tied its sixth

suit.  Ultimately, repairs were made after Oosterbaan vacated the Residence on July 20, 2018.

Phillips claims damages allegedly arising from that delay and for breach of contract.

**Oosterbaan's Status in the United States**

Oosterbaan is "a citizen of the Kingdom of the Netherlands" and works for the "Ministry of Defense to the Embassy of the Kingdom of the Netherlands."  Aff'd of Alexander Oosterbaan, ¶ 2 (ECF No. 5-1) (hereinafter "First Oosterbaan Aff'd").  He was in the United States as a project officer on a coordinated program with the United States and other nations involving the F-16 program.  *Id.* ¶¶ 2–3.  He had a "USA A2 Visa."  Embassy Lttr., at 6 (ECF No. 5-1); Visa, at 36 (ECF No. 9-1).  Additionally, the United States Department of State issued Oosterbaan an "Official Identification Card."[3]  The card stated Oosterbaan's mission was with the "Netherlands F-16 Program," it had a green border on it, and the back of the card stated Oosterbaan had "immunity from criminal jurisdiction . . . and all appropriate steps shall be taken to prevent *any attack* on the bearer's person, freedom, or *dignity*."  Identification Card, 38–39 (ECF No. 9-1) (emphasis added).

The color of the border and the language on the back of the card show that Oosterbaan was classified as a technical or administrative staff member of the mission.  *See* State Dep't Guide, at 25, 38 (ECF No. 8-5).  Accordingly, he enjoyed the privileges and immunities afforded by Article

---

driest June on record, receiving just 0.07 inch of precipitation during the month."  *See* https://www.ncdc.noaa.gov/sotc/ national/201806.  One would expect less water intrusion and damage during dry months.  Moreover, filing a three-day eviction notice is a curious way to protect the health of the Oosterbaans when they were out of the country in June 2018 and planned to vacate the home in July 2018.

[3]  "Official" in this context refers to a type of position and not to the card being an official document.  *See* U.S. Dep't of State, *Diplomatic & Consular Immunity: Guidance for Law Enforcement & Judicial Authorities*, at 25 (ECF No. 8-5) (hereinafter "State Dep't Guide") (identifying cards as Diplomatic, Official, or Consular).  The seal on the back of Oosterbaan's card confirms the card's official status.  *Id.*; Identification Card, at 39 (ECF No. 9-1).

37 of the Vienna Convention on Diplomatic Relations (1961) during his time in the United States on the F-16 mission, second only in scope to the immunity afforded to diplomatic agents and officers.[4]  *See id.* at 15.

Oosterbaan's specific duty assignment was to work on "the F16 modernization software and hardware program, and hardware integration."  Second Aff'd of Alexander Oosterbaan, ¶ 4.a. (ECF No. 9-1) (hereinafter "Second Oosterbaan Aff'd").  Mr. Oosterbaan contends he performed his duty functions both at Hill Air Force Base and at the Residence.  *Id.* ¶¶ 3, 4; *see also* First Oosterbaan Aff'd, ¶ 12 (ECF No. 5-1).  He provided a letter from the Embassy of the Kingdom of the Netherlands that states the Residence was one of Mr. Oosterbaan's duty stations.  Embassy Lttr., at 6 (ECF No. 5-1).  The letter has a seal on it, but the seal is not raised.  *Id.*

Mr. Oosterbaan attests he "was the lead in F16 tablet cockpit integration," and kept "tablets related to that work" at the Residence.  Second Oosterbaan Aff'd, ¶ 4.b (ECF No. 9-1).  He also "maintained laptop computers and files containing" official documents, including "restricted, confidential, and 'Dutch eyes only' materials at the" Residence.  *Id.* ¶ 4.c.  He "helped perform acquisition and integration of new weapons for the F16 program," and his "own flight, tests and exam preparation related to the F16 program were done from [the Residence] on special computers located there."  *Id.* ¶¶ 4.e, 4.f.

Oosterbaan contends he delayed access to the Residence in June 2018 for two reasons.  He

---

[4]  Phillips contends Oosterbaan has presented no admissible evidence that the Vienna Convention applies in this dispute.  Memo. in Opp'n, at 10 (ECF No. 8).  The court disagrees.  Oosterbaan's Official Identification Card is an "authoritative identity document . . . issued by the U.S. Department of State" that identifies a person's status and "is generally to be relied upon."  State Dep't Guide, at 25 (ECF No. 8-5).  The State Department distinguishes identification cards from U.S. diplomatic visas in that the latter provides only non-conclusive evidence of immunity, such "that the bearer *might* be entitled to privileges and immunities."  *See id.* (emphasis added).

contends he did so pursuant to an agreement not to be disturbed in June and July 2018.  *See id.* ¶¶ 7, 17.  He also contends he did so in furtherance of his mission because he was out of town and "concerned about the confidential information that [he] maintained at the [home]."  *Id.* ¶ 17. Because Phillips asserts Oosterbaan lied and fraudulently represented the facts and his status, the court states the facts more specifically below.

**Events Before the Conflict**

Oosterbaan's Lease Agreement states the landlord has a right of entry, with or without the tenant's presence, "[u]nless otherwise restricted by law."  Lease Agmt., at 3 (ECF No. 2-1).  It also states any modifications to the agreement had to be done "in writing [and] signed by all parties." *Id.* at 4.

On July 26, 2017, Oosterbaan notified Howard about a water leak that appeared to be coming from an upper floor.  Email, at 22–23 (ECF No. 9-1).  On August 16, 2017, Howard informed Oosterbaan there was a buyer interested in viewing the property, and said that his real estate agent, Dave Stokoe, would communicate with Oosterbaan to schedule a showing at a time convenient to the Oosterbaans.  Email, at 20 (ECF No. 9-1).  On August 25, 2017, Howard informed Oosterbaan that Stokoe also would coordinate a time for a contractor to fix the leak. Email, at 22 (ECF No. 9-1).  Thus, Stokoe became Oosterbaan's contact for scheduling and repair matters.

In March 2018, Stokoe informed Oosterbaan that Howard planned to start marketing the property anew.  Email, at 12 (ECF No. 9-1).  Stokoe noted that he planned to set up the showing requests, and stated, "I imagine your preferece [sic] will be to be home during the showings and you would prefer to let the showing agent and buyers in."  *Id.* at 11–12.  In response, Oosterbaan

5

asked that their quiet enjoyment not be compromised, and he set forth times when showings could occur. *Id.* at 11. Oosterbaan further asked that "June and beginning of July . . . be reserved for our move & move preparation" because they would be packing. *Id.* Stokoe responded that they would "schedule showings around the guidelines [Oosterbaan] outlined." *Id.*

Phillips viewed the Residence for the first time on April 10, 2018, and made an offer to purchase it on April 12, 2018. Phillips Aff'd, ¶¶ 4, 7 (ECF No. 8-2). He said he had been warned by his agent that the Oosterbaans "would be difficult during viewings." *Id.* ¶ 4. Phillips attests "[t]he preview was very odd and rushed and [he] was ushered out of the home in a very short amount of time." *Id.* He said the same thing happened during his second visit on April 21, 2018, and that "Oosterbaan's wife shadowed [him] at every turn." *Id.* ¶ 5.

After talking with Phillips on April 21st, Oosterbaan expressed concern to Stokoe about how the lease would operate and how his security deposit would be refunded. Email, at 28 (ECF No. 9-1). Stokoe told Oosterbaan that he uses the same lease agreement for all of his rentals, and Stokoe explained how the lease functioned legally. *Id.* at 27–28. Stokoe also told him that Phillips was aware of the lease terms, including the right of entry at will, and other agreements between the parties. *Id.* Stokoe further told Oosterbaan that Howard had authorized Stokoe to release the security deposit to Oosterbaan at the time of the final walkthrough with Phillips. *Id.* at 28. Stokoe noted that was a deviation from the lease terms, but he thought the change would be acceptable to Oosterbaan. *Id.* Stokoe told Oosterbaan he anticipated the final walkthrough would occur on May 17, 2018, and that he had set up a time for a five-hour inspection on April 24, 2018. *Id.* In response, Oosterbaan informed Stokoe that he would be at the Residence when the inspector arrived. *Id.* at 27.

Inspections were conducted on or about April 24th (general inspection), April 26th (mold inspection), and April 27th (stucco inspection).  On April 29, 2018, Stokoe informed Oosterbaan that the inspector had found "a number of property repairs" that needed to be addressed and informed Oosterbaan that contractors would be at the Residence the following day.  Email, at 14 (ECF No. 9-1).  Oosterbaan replied that they had been disturbed by the number of showings and inspections, and that the one on April 24, 2018 was "the most displeasing" [with lights being left on as one issue].  *See id.* at 14–15.  Oosterbaan further said, "[t]hat is why we insist being present at all times." *Id.* at 14.  Oosterbaan reminded Stokoe of their agreement not to be disturbed in June and July 2018, even by Phillips.  *Id.*  Stokoe replied, "I agree that we should get all these items taken care of in May so, *as promised*, you can have *June/July undisturbed* to move." *Id.* (emphasis added).

On May 16, 2018, Oosterbaan emailed Stokoe and asked for the date of the final walkthrough.  Email, at 17 (ECF No. 9-1).  Stokoe told him it would not be on May 17th, but that he would try to finalize the time as soon as possible.  *Id.*  On May 29, 2018, Oosterbaan again asked about the walkthrough date, and whether it would occur that week.  Stokoe informed Oosterbaan the walkthrough would not be that week, but would occur sometime the following week, which was the week of June 3rd.  *Id.*  Oosterbaan told Stokoe that week would not work, and that the next available time would be July 2, 2018.  *Id.*  Stokoe responded, "Let's plan on that. Thanks Alex." *Id.*

Despite the above, Howard submitted an affidavit stating there never was an agreement for the Oosterbaans not to be disturbed in June and July 2018.  Danial Howard Aff'd, ¶ 12 (ECF No. 8-1).  Likewise, Phillips asserts that Oosterbaan lied about having an agreement not to be disturbed

in June and July 2018, and that he lied about there being an agreement to have a walkthrough in early July 2018.  *See* Memo. in Opp'n, at 2–3.  Phillips further asserts that Oosterbaan refused to allow Phillips to have a final walkthrough before closing.  *See* Complaint, ¶ 11 (ECF No. 2); Memo. in Opp'n, at 2 (ECF No. 8); Phillips Aff'd, ¶ 31 (ECF No. 8-2).  Based on the emails cited above, Howard's and Phillips' contentions are not well-taken.

**Events in June and July 2018**

As stated above, Phillips notified Oosterbaan about the mold problem on June 1, 2018.  He then told Oosterbaan that he had stayed in town to have the mold remediated and intended to enter the Residence.  Phillips Aff'd, ¶ 16 (ECF No. 8-2).  Oosterbaan became upset about the intrusion and informed Phillips that he could not enter based on Oosterbaan's diplomatic status and due to the agreement not to be disturbed during June and July 2018.  Email, at 4 (ECF No. 2-4).  Oosterbaan also stated he would hold Phillips "liable for any damage or disruption of [their] personal *or government* property."  *Id.* (emphasis added).  In response to Oosterbaan's refusal to allow entry, Phillips served a 24 Hour Notice of Intent to Enter, citing the Lease Agreement as authority, and informed Oosterbaan to contact Phillips' attorney if he had questions.  Phillips Aff'd, ¶ 21 (ECF No. 8-2), Notice, at 2 (ECF No. 2-3).  Oosterbaan again refused entry, citing the agreement not to be disturbed, his diplomatic status, and that a walkthrough had been scheduled for July 2, 2018.  Email, at 3–4 (ECF No. 2-4); Phillips Aff'd, ¶ 22 (ECF No. 8-2).  Oosterbaan warned that "Alarm is on.  Police will be dispatched and we will press charges."  Email, at 4 (ECF No. 2-4).

Phillips' attorney next sent Oosterbaan a Notice of Resident Default Letter on June 8, 2018.  Phillips Aff'd, ¶ 23 (ECF No. 8-2).  Oosterbaan responded on June 11, 2018 that his diplomatic

status took precedence over the lease and included a copy of his State Department identification card. *Id.* ¶ 24. He also said he had proof of the agreements not to be disturbed and of the July 2nd walkthrough. *Id.* Phillips investigated whether the concept of inviolability applied to private landlords and was told inviolability does "not normally [apply] to private landlords/property owners." Email, at 2 (ECF No. 2-6). Therefore, on June 15, 2018, Phillips served Oosterbaan with a Three Day Notice to Comply with Lease or Vacate by posting the notice on the front door of the Residence and mailing and emailing it to Oosterbaan. Notice, at 2, 4 (ECF No. 2-7); Email, at 3 (ECF No. 2-8). The notice informed Oosterbaan if a court found him "to be in unlawful detainer," he would "be evicted by the court."[5] Notice, at 2 (ECF No. 2-7).

On June 18, 2018, Oosterbaan disputed being in default and asked that the eviction notice be rescinded. Email, at 2–3 (ECF No. 2-8). On June 19, 2018, he emailed Phillips' counsel "[i]n an effort to deescalate the matter." Email, at 2 (ECF No. 2-9). His email stated the following:

> Although I would prefer to have Mr. Phillips wait until 2 July 2018, please inform Mr. Phillips that he has my permission to enter the premises to conduct the repair mentioned in the 24-hour Notice of Intent to Enter. To be able to *turn off the alarm (and back on)* and *to have an Air Force member present*, I am requesting at least a days [sic] notice to make arrangements.
>
> I would like Mr. Phillips to be aware that:
> None of our personal property may be touched or disturbed. We need to be made aware of any chemicals that will be used. We need to know if there is a danger of damage to our health or property. We need to be made aware if there will be dust resulting from repairs

---

[5]    Inviolability protects the private residence and property of diplomatic agents, and by incorporation, administrative staff as well. *See* Articles 30 and 37(2) of the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502, 500 U.N.T.S. 96, (hereinafter "Vienna Convention"). It therefore is questionable that the powers of the court could be employed to have a state agent enter a private residence and evict an administrative officer and his property.

> and how Mr. Phillips intends to protect our property.  If any damages occur we will hold Mr. Phillips liable and file suit.
>
> If the house is being dirtied, a cleaning crew needs to be hired upfront. I expect the house to be in the same condition as it is now. Utilities are being payed [sic] by us. If utilities need to be used by him or repair crew, they have to be reimbursed upfront or be put in his name. Shoes need to be left outside. If shoes have to be worn inside then Mr. Phillips is responsible to have house cleaned. This must be known upfront.
>
> Sincerely,
> Alexander Oosterbaan.

Email, at 2–3 (ECF No. 2-9) (emphasis added).  Phillips viewed the email "as nothing more than a thinly veiled pretext for a lawsuit."  Phillips Aff'd, ¶ 30 (ECF No. 8-2).  Accordingly, Phillips filed suit himself on June 26, 2018.

Of import to this decision, Oosterbaan and his family were out of the country starting on June 3, 2018 and did not return until on or about July 1, 2018.  *See* Second Oosterbaan Aff'd, ¶¶ 19–20 (ECF No. 9-1) (stating when he was leaving Salt Lake City); Email, at 3 (ECF No. 2-9) (stating he was out of the country); Email, at 3 (ECF No. 2-4) (stating when he would return). Thus, Oosterbaan could not follow his pattern and practice to be present any time someone entered the Residence due to the mission materials he kept at that duty station.  Through Oosterbaan's efforts, however, the July 2, 2018 walkthrough occurred on the scheduled date.  Emails, 31–33 (ECF No. 9-1).  On July 20, 2018, Phillips and both counsel conducted a final walkthrough, and the Oosterbaans vacated the property as previously agreed.  Second Oosterbaan Aff'd, ¶ 2 (ECF No. 9-1).

## ANALYSIS

I.   **JURISDICTIONAL AUTHORITY**

   A.   **Section 1351**

The Complaint in this case is for breach of contract and unlawful detainer, which are state law claims.  The parties assert this court has jurisdiction, however, based on 28 U.S.C. § 1351.  Section 1351 grants a district court original jurisdiction "of all civil actions and proceedings against . . . *members of a mission* or members of their families (as such terms are defined in section 2 of the Diplomatic Relations Act)."  28 U.S.C. § 1351(2) (emphasis added).

The Diplomatic Relations Act (or the "Act") defines "members of a mission" as including "members of the administrative and technical staff of a mission."  22 U.S.C. § 254a(1)(B).  Oosterbaan's official status falls within this definition.  Section 1351, therefore, is applicable.

   B.   **Subject Matter Jurisdiction vs. Personal Jurisdiction**

Although Section 1351 is applicable in this case, that section cannot be viewed in isolation because the Act sets forth additional jurisdictional rules.  "The Diplomatic Relations Act  . . . incorporated the [Vienna Convention] into U.S. law and repealed contradictory earlier legislation."  *Broidy Capital Mgmt., LLC v. Benomar*, 944 F.3d 436, 442 (2d Cir. 2019) (citing Pub. L. No. 95-393, 92 Stat. 808 (1978) (codified at 22 U.S.C. §§ 254a-e, 28 U.S.C. § 1364)).  The Act requires a court to dismiss "'any action or proceeding brought against an individual who is entitled to *immunity* with respect to such action or proceeding under the Vienna Convention.'"  *Id.* (quoting 22 U.S.C. § 254d) (emphasis added).  This means even though Section 1351 grants the court original jurisdiction to hear this case, the Diplomatic Relations Act can divest a court of that jurisdiction, if diplomatic immunity has been established, such that dismissal of the action is

mandated.  Thus, the issue before the court is whether Oosterbaan's diplomatic status grants him immunity from this suit.

Oosterbaan has moved to dismiss this action under Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction.  The Tenth Circuit, however, has applied subject-matter jurisdiction when determining if a case is barred by governmental immunity.  *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).  It also has applied subject-matter jurisdiction when determining if a case is barred by the Foreign Sovereign Immunities Act of 1976.  *Southway v. Cent. Bank of Nig.*, 328 F.3d 1267, 1274 (10th Cir. 2003).  Courts from other jurisdictions have applied subject-matter jurisdiction specifically in the context of determining diplomatic immunity under the Diplomatic Relations Act.  *Broidy*, 944 F.3d at 443 (stating "[d]iplomatic immunity is a matter of subject-matter jurisdiction") (citing *Brzak v. United Nations*, 597 F.3d 107, 110–11 (2d Cir. 2010); *Tachiona v. United States*, 386 F.3d 205, 209, 215 (2d Cir. 2004)); *see also United States v. Sharaf*, 183 F. Supp. 3d 45, 49 (D.D.C. 2016) (analyzing diplomatic immunity under subject-matter jurisdiction).  The court therefore concludes that Oosterbaan's motion to dismiss should be decided under Rule 12(b)(1) for subject-matter jurisdiction, and not Rule 12(b)(2) for personal jurisdiction.

Although the parties' briefing, oral arguments, and evidence were submitted pursuant to Rule 12(b)(2), "[t]he district court must always ensure its own subject-matter jurisdiction regardless of whether it has been addressed by the parties."  *Zivkovic v. Hood*, 694 F. App'x 661, 662 (10th Cir. 2017) (citing *McAlester v. United Air Lines, Inc.*, 851 F.2d 1249, 1252 (10th Cir. 1988)).  "If the district court lacks subject-matter jurisdiction, dismissal is required."  *Id.* (citations omitted).

### C.      Burden of Proof

Even though the court must decide Oosterbaan's motion under Rule 12(b)(1), the same facts, evidence, and much of the arguments presented by the parties remain applicable to the court's determination.  In other words, even if the briefing had focused on Rule 12(b)(1) rather than Rule 12(b)(2), it would not have changed the facts, evidence, or most of the arguments for this particular case.

What is different, however, is the burden of proof.  For personal jurisdiction, when "there has been no evidentiary hearing, and the motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written material, the plaintiff need only make a prima facie showing that jurisdiction exists." *XMission, L.C. v. Fluent Ltd. Liab. Co.*, 955 F.3d 833, 839 (10th Cir. 2020) (quotations and citation omitted).  "If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Behagen v. Amateur Basketball Ass'n*, 744 F.2d 731, 733 (10th Cir. 1984) (citations omitted).

In contrast, subject-matter jurisdiction is determined based on a preponderance of the evidence. *Southway*, 328 F.3d at 1274.  When a defendant goes "beyond allegations contained in the complaint," as Oosterbaan did here, "and challenge[s] the facts upon which subject matter jurisdiction depends, . . . a district court may not presume the truthfulness of the complaint's factual allegations." *Holt*, 46 F.3d at 1003 (citation omitted).  The "court has wide discretion to allow affidavits [and] other documents . . . to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id.* (citations omitted).  Nevertheless, it should not convert a motion to dismiss to a summary judgment motion unless "the jurisdictional question is intertwined with the merits of the case." *Id.*

(citation omitted).  A " jurisdictional question [becomes] intertwined with the merits of the case if subject matter jurisdiction is dependent on the same statute which provides the substantive claim in the case."  *Id.* (citation omitted).  "The party invoking federal jurisdiction bears the burden of establishing these elements."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citations omitted).

Here, Phillips has invoked federal jurisdiction and bears the burden of proving by a preponderance of the evidence that the court has subject-matter jurisdiction.  Oosterbaan bears the burden to show "diplomatic status," but once shown, Phillips "bear[s] the burden of proving . . . that an exception to diplomatic immunity applies and that jurisdiction therefore exists."[6]  *Broidy Capital Mgmt.*, 944 F.3d at 444.  Additionally, in this case the jurisdictional question of immunity is not intertwined with the same statute or elements of the substantive claims.  Thus, the court will address jurisdiction based on the motion to dismiss.  Finally, the parties elected at the hearing not to put on witnesses and submitted the decision to the court based on affidavits and other documents.  The court, therefore, will decide jurisdiction using that documentary evidence.

## II.    PURPOSE OF DIPLOMATIC IMMUNITY

The State Department has stated that "[d]iplomatic and consular immunity are not intended to benefit the individual; they are intended to benefit the mission of the foreign government or international organization."  State Dep't Guide, at 29 (ECF No. 8-5).  Such immunity affords

---

[6]  Phillips contends Oosterbaan bears the burden based on the Foreign Sovereign Immunities Act ("FSIA").  Memo. in Opp'n, at 10, 12 (ECF No. 8 ).  The FSIA typically has not been used as an interpretive guide when deciding immunity under the Vienna Convention and the Diplomatic Relations Act because the FSIA does not afford individual immunity and it did not arise via a treaty.  *See Broidy*, 944 F.3d at 444 (citations omitted); *Logan v. Dupuis*, 990 F. Supp. 26, 27 n.2, 30 (D.D.C. 1997) (citations omitted).

14

reciprocal protection to United States' diplomats.  Protecting "foreign diplomates in this country" helps "ensure[] that similar protections will be accorded those that we send abroad to represent the United States, and thus serves our national interest in protecting our own citizens." *Boos v. Barry*, 485 U.S. 312, 323 (1988).  This benefits the United States "greatly . . . [because] it protects U.S. diplomats assigned to countries with judicial systems far different than our own."[7]  State Dep't Guide, at 13 (ECF No. 8-5).

Thus, when the State Department issued an identification card to Oosterbaan, it stated on the back that efforts should be taken to "prevent *any attack* on the bearer's person, freedom, or *dignity*."  Despite such admonition, Phillips and those associated with him have repeatedly accused Oosterbaan of lying to them and to the court.  Because of this direct attack on Oosterbaan, the court addresses Phillips' contentions.

In Utah, an agency relationship is formed when (1) a person manifests that another individual may "act for him;" (2) the individual accepts "the proposed undertaking," and (3) both the person and the individual understand that the individual will "be in charge of the undertaking." *Wardley Corp. v. Welsh*, 962 P.2d 86, 89 (Utah Ct. App. 1998) (citations omitted).  The above evidence supports that Stokoe operated as Howard's agent.  Howard directed Oosterbaan to communicate through Stokoe.  Through the course of dealings between the parties, Stokoe handled all scheduling, including when the Oosterbaans would be disturbed and when they would not be disturbed, and when a walkthrough would occur.  This course of dealings and informal modifications to the Lease Agreement are well-documented.

---

[7]  This does not mean a diplomat may ignore or break the laws of Utah and the United States.  But is does mean if such laws are broken, our judicial system is not the means by which to seek redress.

Stokoe told the Oosterbaans that, "as promised," they would not be disturbed in June and July 2018.  Stokoe agreed that the final walkthrough would occur on July 2, 2018.  While it is important to remediate mold, Phillips evidenced no concern for the Oosterbaans' health and safety from the time he obtained the mold report on May 1, 2018 until he told the Oosterbaans about the mold on June 1, 2018.  Had there been a true emergency, perhaps entry into the Residence would have been viewed differently.  Phillips' delay in addressing the mold issue, however, supports that it was based more on convenience to him rather than urgent need.

It also bears noting that the evidence supports that when Oosterbaan stated he would do something, he followed through and met each of his obligations.  Indeed, it was Oosterbaan who sought to schedule the final walkthrough on two different occasions in May 2018 and who confirmed the walkthrough would still occur on July 2, 2018, despite Phillips' suit.  The Oosterbaans also vacated the property when they said they would, and they left the place without damage from their use.  Thus, the court concludes that Phillips' allegations that Oosterbaan lied to him and the court are without merit.

## III.  APPLICABILITY OF THE VIENNA CONVENTION

### A.  Performance of Duties

Although the evidence supports Oosterbaan delayed entry pursuant to an agreement with Howard's agent, the court does not resolve whether there was a breach of contract or unlawful detainer.  Instead, Oosterbaan's immunity is dispositive and divests this court of jurisdiction.  Oosterbaan contends the Residence was one of his duty stations and that he delayed entry, in part, due to sensitive mission materials kept there.

Article 37(2) of the Vienna Convention states,

> Members of the administrative and technical staff of the mission . . . shall . . . enjoy the privileges and immunities specified in Articles 29 to 35, *except that the immunity* from civil and administrative jurisdiction of the receiving State specified in paragraph 1 of Article 31 *shall not extend to acts performed outside the course of their duties*.

Vienna Convention, art. 37(2). Oosterbaan's immunity, therefore, is dependent on whether he was operating within the course of his duties when he delayed entry into the Residence while he was out of the country.

Oosterbaan has submitted a letter from his employer, the Embassy of the Kingdom of the Netherlands, to show that the Residence was one of Oosterbaan's duty stations. Phillips opposed admission of the letter as hearsay, but the court overruled Phillips' objection during the hearing on this matter. Rule 803(8) of the Federal Rules of Evidence allows admission of public records. Although the rule does not expressly state that it applies to documents created by a foreign government, "courts regularly admit foreign documents" under the rule, as long as the foreign document "would be [an] official document[] if prepared in the United States." *United States v. Regner*, 677 F.2d 754, 762–63 (9th Cir. 1982) (Ferguson, J., dissenting) (citing collection of cases allowing admission of foreign documents under Rule 803(8)). The court concludes the letter satisfies this requirement.

The letter is a statement from an Embassy located in Washington D.C. It bears an official seal and is signed by the "Location Manager U.S.A." The letter sets forth the office's activities, i.e., the work being done by one of its employees. It also states where the Embassy placed Oosterbaan to carry out such duties. Thus, it satisfies the requirements for Rule 803(8).

Even if Rule 803(8) were inapplicable, the court finds the letter satisfies Rule 807

requirements.  Oosterbaan had to respond to Phillips' complaint on an expedited basis.  He provided the most probative evidence he could under those circumstances.  Moreover, the letter has indicia of trustworthiness.  It is stamped with an official seal.  The letter is consistent with Oosterbaan's identification card from the State Department, and the letter listed a name and telephone number of the Location Manager that one could have called to confirm the contents.  Based on the expedited response time, the court finds good cause as to why Oosterbaan simultaneously submitted the letter with his Motion to Dismiss.  The court also finds that Phillips had a reasonable opportunity to controvert the letter.  Accordingly, the court admits the letter as evidence that the Residence was one of Oosterbaan's duty stations.

Oosterbaan also submitted two declarations in which he attested to keeping mission materials at the Residence.  After he vacated the property, Oosterbaan detailed the nature of those materials.  The list is what one would expect based on Oosterbaan's mission.  The list supports why, throughout the lease period, Oosterbaan precluded entry into the Residence without his or his wife's presence.  When Phillips experienced Oosterbaan's wife shadowing him during a preview, her conduct was consistent with Oosterbaan protecting mission materials.  Likewise, Oosterbaan's reaction when Phillips attempted to enter the Residence while the family was out of the country demonstrates protection of property.[8]  This is so for the property itself and for its contents.

Oosterbaan informed Phillips he would arrange for a member of the Air Force to be present

---

[8]  Oosterbaan's reaction also appears to contain frustration or anger over agreements not being honored.  *See* Second Oosterbaan Aff'd, ¶¶ 16–17 (ECF No. 9-1).  Even if Oosterbaan partly delayed entry due to an agreement, it does not negate that he also acted in furtherance of his duty to protect confidential mission materials.

since Oosterbaan could not be there himself.  Oosterbaan also noted in a June 6, 2018 email to Phillips that he had government property on the premises.  Specifically, Oosterbaan kept special computers, tablets, and documents at the Residence.  The mold remediation proposal involved removal of "all wet and moldy building material in the contained area," HEPA filters, sanding or replacement of wood, application of chemicals, and so forth.  Mold Remediation Proposal, at 11 (ECF No. 8-2).  It was not unreasonable for Oosterbaan to demand that his personal and government property not be damaged during repairs of that scope.  In other words, Oosterbaan sought not only to protect the property from disclosure, but also from damage.  The court concludes both types of protection were within the scope of his duties.

Accordingly, the court concludes Oosterbaan has presented sufficient evidence to support that the Residence was his duty station and that his denial of entry was in furtherance of his mission.  The evidence supports Oosterbaan sought to protect confidential mission materials by excluding Phillips from the property while Oosterbaan was out of the country, and he further sought to protect the property from damage.  Because Oosterbaan has presented sufficient evidence to support diplomatic immunity, Phillips bears the burden to prove by a preponderance of the evidence that the immunity is inapplicable.

### B.   Rebuttal Arguments to Immunity

Phillips contends even if Oosterbaan does have diplomatic status, he is not entitled to immunity because (1) Oosterbaan failed to show he was operating within the scope of his duties, (2) the Residence was not a duty station, and (3) this action largely is an *in rem* proceeding subject to an immunity exception under Article 31(1)(a) of the Vienna Convention.

### i.  *Outside Scope of His Duties*

Phillips contends Oosterbaan could not have been operating within the scope of his duties because he engaged in "lying, bullying, making threats, and being verbally abusive."  Memo. in Opp'n, at 14 (ECF No. 8).  The allegations about lying have been addressed above.  How Oosterbaan reacted on certain occasions or what his demeanor was towards Phillips does not show he operated outside the scope of his duties.[9]  This case was pled as a breach of contract and unlawful detainer action.  Phillips' focus on Oosterbaan's demeanor is not relevant to the issue at hand, i.e., determining if Oosterbaan acted within the scope of his duties in delaying entry into the Residence while he was out of the country.

### ii.  *Contentions that Residence Was Not a Duty Station*

Phillips also seeks to controvert Oosterbaan's contention that the Residence was a duty station and that Oosterbaan was protecting sensitive mission materials.  He has submitted affidavits attesting (1) Oosterbaan did not disclose his status when he entered the lease, (2) the Residence only had a standard security system, and (3) the Residence only had a standard internet provider.  None of these facts rebut the evidence presented.

Phillips has cited no authority that Oosterbaan had to disclose his diplomatic status.  To the extent that Phillips is arguing Oosterbaan waived his diplomatic status by failing to disclose it, as discussed above, Oosterbaan cannot waive immunity.  *Logan*, 990 F. Supp. at 31 (stating a

---

[9]   The affidavits and briefing attacking Oosterbaan's character were not an appropriate litigation tactic.  Instead of focusing on the immunity issue, Phillips wrapped his arguments in a heavy layer of allegations about fraud and bullying.  Doing so obfuscated the actual issue before the court.  The court cautions that when making such serious allegations against another, more care, rather than less, should be exercised.

diplomat "has no authority to waive his immunity from civil jurisdiction; that is the prerogative of the" sending state); *see also* Vienna Convention, art. 32 (stating waiver must be done "by the sending State" and it "must always be express").

As to the security system, the Residence had a camera and motion sensors to detect an intruder and sound an alarm.  The Oosterbaans monitored access to the property via that security system and their own efforts to be present when others entered the home.  The lack of additional cameras or other security features is insufficient to prove by a preponderance of the evidence that the Residence was not a duty station and that Oosterbaan did not keep sensitive mission documents there.

As to the internet, an internet provider allows access to the internet, but whether such connection is secure is a different issue.  Due to COVID-19, many employees have become familiar with connecting to the office through virtual private networks and multi-factor authentication methods.  It is not the internet provider that determines the degree of security for that connection, but the method by which the connection is made.  Thus, who Oosterbaan's internet provider was does not support that Oosterbaan connected to the internet through a non-secure connection.  It also fails to disprove that the Residence was a duty station.

Even when Phillips' evidence is viewed collectively, it fails to show by a preponderance of the evidence that the Residence was not a duty station or that Oosterbaan did not keep mission materials there.

      iii.    *In Rem* Proceeding

Finally, Phillips contends Article 31(1)(a) of the Vienna Convention is applicable and provides an exception to Oosterbaan's diplomatic immunity.  The Article states an exception to

immunity from civil suits exists "in the case of . . . [a] real action relating to private immovable property situated in the territory of the receiving State."   Vienna Conv., art. 31(1)(a).   Phillips contends "[t]his action was brought in unlawful detainer and therefore is a quintessential action in rem, or 'real action.'"   Memo. in Opp'n, at 16 (ECF No. 8).

The provisions in Utah's unlawful detainer statute demonstrate "a strong desire by the legislature to create a mechanism pursuant to which owners can be restored to possession of their property" expeditiously.   *Martin v. Kristensen*, 2019 UT App 127, ¶ 34, 450 P.3d 66, 74 (quotations and citation omitted).   Phillips, however, obtained possession of the property before briefing on the Motion to Dismiss was even completed.   What remains is a claim for damages and whether those damages may be pursued under the real action exception to diplomatic immunity.

In *Logan*, the court cited to a leading commentary on diplomatic immunity that stated "'[t]he essence of the term 'real action' is that *the relief sought* is either a declaration of title to the property, an order for sale by authority of the court, or an order for possession.'"   *Logan v. Dupuis*, 990 F. Supp. 26, 29 (D.D.C. 1997) (quoting Eileen Denza, *Diplomatic Law* 159–60 (1976) (emphasis added)).   "To qualify as a case fit for federal-court-adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."   *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (citations omitted).   While Phillips may have sought possession of the Residence at the time the Complaint was filed, that is no longer the relief being sought.   Indeed, that relief is moot.

Moreover, the *Logan* court cited another leading commentary that stated, "'it would be straining the meaning" of a real action "to say that a claim to effect repairs, as opposed to one to take over possession of the premises, was a real action.'"   *Logan*, 990 F. Supp. at 29 (quoting

Charles J. Lewis, *State and Diplomatic Immunity* 139 (3d ed. 1990)).  Here, this dispute arose when Phillips decided to enter the Residence immediately to make repairs.  Had Phillips sought relief in court to enter the Residence to make the repairs, his claim would have been barred by diplomatic immunity because Oosterbaan delayed entry in furtherance of his duties.

Yet, somehow Oosterbaan's actions to protect confidential mission documents should divest him of immunity according to Phillips.  "The purpose of the Convention" is "'to ensure the efficient performance of the functions of diplomatic missions.'"  *Id.* at 30 (quoting Vienna Convention, Preamble).  To find Oosterbaan's immunity stripped even though he was carrying out his duty functions seems incongruous with the purpose of the Vienna Convention.  The Convention's purpose "confirms that the exceptions to diplomatic immunity should be read narrowly." *Id.*  To do otherwise would defeat the purpose of the treaty.  Allowing Article 31(1)(a) to extend to a claim only for damages is not a narrow construction of what constitutes a "real action."  Accordingly, the court concludes Article 31(1)(a) is inapplicable and Phillips' claims are barred by diplomatic immunity.

## CONCLUSION

For the reasons stated above, the court terminates the Motion to Dismiss (ECF No. 5) and dismisses this action, without prejudice, for lack of subject-matter jurisdiction pursuant to 22 U.S.C. § 254d.

DATED this 18th day of December, 2020.

BY THE COURT:

Clark Waddoups
United States District Judge